CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General

JAMES E. WEAVER
Senior Litigation Counsel, Tax Division
AMY MATCHISON (CA SBN 217022)
Trial Attorney, Tax Division
United States Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 305-4929
Email: James.E.Weaver@usdoj.gov
        Amy.T. Matchison@usdoj.gov

Attorneys for Petitioner
THE UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Case No. 3:16-cv-0377-LB |
| Petitioner, | ) |
| | ) **AMENDED DECLARATION OF** |
| v. | ) **NINA WU STONE IN SUPPORT OF** |
| | ) **AMENDED PETITION TO ENFORCE** |
| FACEBOOK, INC. AND SUBSIDIARIES | ) **INTERNAL REVENUE SERVICE** |
| (a Consolidated Group), | ) **SUMMONSES** |
| | ) |
| Respondent. | ) |

I, Nina Wu Stone, pursuant to 28 U.S.C. § 1746, declare as follows:

1.   I am a Revenue Agent for the Large Business and International Division of the Internal Revenue Service ("IRS").  My post of duty is in San Francisco, California.

2.   The IRS is conducting an examination of the federal income tax liability of Facebook, Inc. and Subsidiaries ("Facebook") for the tax period ending December 31, 2010.

3.   Facebook, Inc. is a United States corporation with its principal place of business

Amended Declaration of Nina Wu Stone
In Support of Amended Petition to Enforce
Internal Revenue Service Summonses         1

in Menlo Park, California.

4. I am part of an audit team examining certain related party transactions that I discuss below.

5. I am authorized to issue IRS summonses pursuant to 26 U.S.C. § 7602, 26 C.F.R. § 301.7602-1, and IRS Delegation Order No. 25-1.

6. Leland Wong is a Revenue Agent in the IRS's Large Business & International Division with a post of duty in San Jose, California. Revenue Agent Wong is the Team Coordinator for the underlying examination.

7. Revenue Agent Wong is authorized to issue IRS summonses pursuant to 26 U.S.C. § 7602, 26 C.F.R. § 301.7602-1, and IRS Delegation Order No. 25-1.

8. In furtherance of the examination for 2010 (and two earlier years, 2008 and 2009, that are part of the audit cycle), and in accordance with 26 U.S.C. § 7602, on June 1, 2016, I issued six IRS summonses directing Facebook to produce for examination books, records, papers and other data as described in the summonses. Copies of the six summonses are attached as Exhibits 1-6. The IRS is not seeking enforcement of the summonses with respect to the 2008 and 2009 years.

9. In furtherance of the examination and in accordance with 26 U.S.C. § 7603, on June 1, 2016, I served an attested copy of each of the six summonses on Facebook by personal delivery to David Wehner, the Chief Financial Officer for Facebook, as evidenced by the certificates of service included in Exhibits 1-6.

10. On June 17, 2016, the date scheduled for compliance with the six summonses, Facebook failed to comply and did not produce the books, records, papers, and other data demanded in the summonses.

11. Also in furtherance of the examination for 2010 and in accordance with 26 U.S.C. § 7602, on June 8, 2016, Revenue Agent Wong issued an additional (and seventh) summons directing Facebook to appear at 55 South Market Street, 6th floor, San Jose, California, 95113 on June 29, 2016, at 1:00 p.m. and to produce for examination books, records, papers and other data as described in the summons. A copy of the seventh summons is attached as Exhibit 7. The IRS is not seeking enforcement of the seventh summons with respect to the 2008 and 2009 years.

12. In furtherance of the examination and in accordance with 26 U.S.C. § 7603, on June 8, 2016, Revenue Agent Wong served an attested copy of the seventh summons on Facebook by personal delivery to David Wehner, the Chief Financial Officer for Facebook, as evidenced by the certificate of service included in Exhibit 7.

13. Facebook failed to appear on June 29, 2016, the date scheduled for compliance with the seventh summons, and did not produce the books, records, papers, and other data demanded.

14. Facebook's failure to comply with all seven summonses continues to this date.

15. The books, records, papers, and other data demanded in the seven summonses are not already in the possession of the IRS. During the course of the examination, Facebook has provided the IRS with some documents responsive to earlier requests; however, Facebook has not provided documents in response to the summonses at issue here. To the extent Facebook earlier provided documents that would also be responsive to a summons request, the IRS is not seeking production of those documents.

16. All administrative steps required by the Internal Revenue Code for issuance and service of the summonses have been taken.

Amended Declaration of Nina Wu Stone
In Support of Amended Petition to Enforce
Internal Revenue Service Summonses       3

17. There is no "Justice Department referral," as that term is described in Section 7602(d)(2) of the Internal Revenue Code, in effect with respect to Facebook for the tax period ending December 31, 2010.

18. The books, records, papers, and other data sought by the seven summonses may be relevant to determine Facebook's correct federal income tax liability for the period ending December 31, 2010.

19. The facts set forth in the paragraphs below are based on my review of documents obtained from Facebook during the examination, including transfer pricing reports and related documents that Facebook produced in response to information document requests (IDRs); discussions with representatives of Facebook; conducting interviews of certain Facebook employees; and discussions with IRS staff.

20. The 2010 examination was opened in January 2013 and added to the already-open examination cycle for the 2008 and 2009 tax years.

21. Facebook's tax return for 2010 reported royalty income that I learned came from transfers of intangible property to a controlled foreign corporation, Facebook Ireland Holdings Unlimited. Facebook Ireland Holdings Unlimited was previously known (as of September 15, 2010) as Facebook Ireland Holdings Limited ("Facebook Ireland").

22. According to documents obtained during the examination, Facebook, Inc. ("Facebook U.S.") entered into the following agreements with Facebook Ireland effective September 15, 2010 (collectively, the "2010 Agreements"):

   a. User Base Transfer and Marketing Intangibles License Agreement;
   
   b. Online Platform Intangible Property Buy-In License Agreement;
   
   c. Agreement to Share Costs and Risks of Online Platform Intangible

Property Development.

23. The IRS is examining matters arising under the 2010 Agreements, which, among other things, purported to transfer the rights associated with Facebook's worldwide business to Facebook Ireland, with the exception of the United States and Canada. I refer to the territory outside of the United States and Canada as the rest-of-world ("ROW"). Specifically, the 2010 Agreements purported to transfer Facebook's ROW user base to Facebook Ireland. The 2010 Agreements also purported to transfer rights to the intangible property constituting Facebook's "online platform." The online platform allowed users to communicate, allowed Facebook to store user information, and allowed advertiser/developers to reach those users. The 2010 Agreements also purported to license rights in "marketing intangibles" to Facebook Ireland. Finally, under the 2010 Agreements, Facebook U.S. and Facebook Ireland purported to share future costs to jointly develop the Facebook online platform.

24. Facebook retained Ernst & Young (E&Y) to value these transfers for income tax purposes. In carrying out this assignment, E&Y selected different methodologies to value those intangibles, on the theory that the user base, online platform, and marketing intangibles could be reliably measured on a stand-alone basis.

25. The IRS is authorized under I.R.C. § 482 to allocate income and deductions among commonly controlled or owned business entities as necessary to prevent tax avoidance or to clearly reflect income. In particular, when rights to intangible property are transferred or licensed between related entities, "the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." *Id*. "[T]he standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." Treas. Reg. § 1.482-1(b)(1).

26.     During 2013 and 2014, the IRS gathered information from Facebook in order to understand the 2010 Agreements, E&Y's valuation, and the functions performed by U.S. and foreign entities. The IRS issued a number of information document requests ("IDRs"), reviewed numerous public documents, and conducted interviews of certain Facebook employees. Several of those employees indicated that the user base, online platform and marketing intangibles were interdependent and it would be difficult to isolate one from the other. The information gathered suggested to the IRS examination team that the E&Y approach to valuing Facebook's transferred intangibles on a stand-alone basis was problematic.

27.     On April 17, 2015, the IRS examination team presented its preliminary examination position to Facebook.

28.     On May 27, 2015, Facebook responded to the IRS team's presentation with a presentation of its own.

29.     In its May 27, 2015 presentation, Facebook rejected the IRS team's preliminary position and provided additional arguments and insights regarding the transfers.

30.     Following the May 27, 2015 presentation, the IRS examination team gave careful consideration to the matters that Facebook raised and determined it needed a better understanding of the nature and value of Facebook's user base, distinctions Facebook was drawing between its online platform and its user base, suggestions made by Facebook that Facebook Ireland had developed its own user-based intangibles prior to the 2010 Agreements, risks associated with competitive threats to Facebook's business, and the role of mobile access to the Facebook platform.

31.     Within a month of Facebook's May 27, 2015 presentation, the IRS examination team informed Facebook that it was considering retaining experts to assist with its understanding

of the transfers.  The IRS examination team's preliminary positions suggested that the E&Y valuations of the transferred intangibles were understated by billions of dollars.

32.     Due to budgetary constraints, the IRS team could not commence the lengthy expert retention process until after October 1, 2015.  Because of this, the IRS team asked Facebook to extend the statute of limitations, to afford the team time to confer with experts and follow up with any additional requests for information to Facebook.  Facebook, however, refused to afford the IRS team any further extensions of time, unless the IRS agreed to unacceptable conditions.

33.     On January 13, 2016 the IRS issued IDRs 171-173, requesting documents considered or reviewed by Facebook U.S. and Facebook Ireland regarding 2010 intercompany agreements.  The documents were needed, among other reasons, to provide insight into the nature of the transferred user base and the distinction between user-based intangibles and online platform intangibles.  Facebook responded by producing only three e-mails with attachments.  In March 2016, Facebook explained that it had narrowly construed IDRs 171-173 to be limited to documents reviewed by both Facebook U.S. and Facebook Ireland, resulting in the minimal document production.  Facebook indicated that the IRS would have to start over with issuance of a new set of IDRs if the IRS wanted a more comprehensive response.  Given the limited time remaining before the statute of limitations would expire, the IRS issued a summons seeking similar information it needed that was not provided by Facebook because of its narrow interpretation of the IDRs.  A copy of that summons is attached as Exhibit 1.

34.     The documents requested by the summons attached as Exhibit 1 seek information regarding the 2010 Agreements, and thus may be relevant to determining the value of the transferred intangibles.

Amended Declaration of Nina Wu Stone
In Support of Amended Petition to Enforce
Internal Revenue Service Summonses         7

35. On April 7, 2016 the IRS issued additional IDRs to obtain business information from Facebook that may be relevant to valuing transferred intangibles. Key topics addressed by these IDRs included:

- IDR 178 -- documents regarding business risks associated with Facebook's competitors;
- IDR 179 -- documents regarding company and budget goals, and Facebook's decision to make Dublin, Ireland its international headquarters;
- IDR 180 -- documents regarding growth in the user base and how to measure that growth;
- IDR 181 -- documents used by advertisers to target users;
- IDR 182 -- documents regarding features built into the online platform;
- IDR 183 -- documents regarding hiring of international employees to expand user growth;
- IDR 184 -- documents regarding international sales offices;
- IDR 185 -- documents regarding products built for advertisers;
- IDR 186 -- documents regarding developers who build user applications;
- IDR 187 -- documents regarding support services for the user base.

36. Facebook has not provided any documents to the IRS examination team in response to IDRs 178-187. Although Facebook proposed search terms (to search for electronically-stored information of individual custodians), Facebook predicated any production on obtaining an agreement under Federal Rule of Evidence 502.

37. Given the July 31, 2016 expiration of the statute of limitations, the IRS issued additional summonses (Exhibits 2-6) to Facebook demanding the documents sought by IDRs

178-187.  The IRS also issued a seventh summons (Exhibit 7).

38. The documents requested by the summons attached as Exhibit 2 primarily seek the information requested in IDRs 178-179.  The documents sought by the requests in this summons may be relevant to understanding the risks associated with competitive threats to Facebook's business and Facebook executives' internal views regarding the transferred intangibles, and thus may be relevant to determining the value of the transferred intangibles.  I have redacted certain proprietary and/or employee information contained in the attached Exhibit 2.

39. The documents requested by the summons attached as Exhibit 3 primarily seek the information requested in IDRs 180-181.  The documents sought by the requests in this summons may be relevant to the nature of the user base, distinctions Facebook was drawing between its online platform and its user base, suggestions made by Facebook that Facebook Ireland had developed its own user-based intangibles prior to the 2010 Agreements, and the role of mobile access to Facebook users, and thus may be relevant to determining the value of the transferred intangibles.  I have redacted certain proprietary and/or employee information contained in the attached Exhibit 3.

40. The documents requested by the summons attached as Exhibit 4 primarily seek the information requested in IDRs 182-183.  The documents sought by the requests in this summons may be relevant to the nature of the user base, distinctions Facebook was drawing between its online platform and its user base, and suggestions made by Facebook that Facebook Ireland had developed its own user-based intangibles prior to the 2010 Agreements, and thus may be relevant to determining the value of the transferred intangibles.  I have redacted certain proprietary and/or employee information contained in the attached Exhibit 4.

41. The documents requested by the summons attached as Exhibit 5 primarily seek the information requested in IDRs 184-185. The documents sought by the requests in this summons may be relevant to distinctions Facebook was drawing between its online platform and its user base, and suggestions made by Facebook that Facebook Ireland had developed its own user-based intangibles prior to the 2010 Agreements, and thus may be relevant to determining the value of the transferred intangibles. I have redacted certain proprietary and/or employee information contained in the attached Exhibit 5.

42. The documents requested by the summons attached as Exhibit 6 primarily seek the information requested in IDRs 186-187. The documents sought by the requests in this summons may be relevant to the nature of the user base, distinctions Facebook was drawing between its online platform and its user base, and suggestions made by Facebook that Facebook Ireland had developed its own user-based intangibles prior to the 2010 Agreements, and thus may be relevant to determining the value of the transferred intangibles. I have redacted certain proprietary and/or employee information contained in the attached Exhibit 6.

43. The documents requested by the summons attached as Exhibit 7 may be relevant to understanding Facebook executives' internal views regarding the transferred intangibles, Facebook's valuation with respect to third-party investors, Facebook's valuation with respect to the sale of stock by Facebook employees, and valuation modeling with respect to acquired companies, and thus may be relevant to determining the value of the transferred intangibles. I have redacted certain proprietary and/or employee information contained in the attached Exhibit 7.

1 | I declare under the penalty of perjury that the foregoing is true and correct.

2 | Executed this 25 day of July, 2016, in San Francisco, California.

NINA WU STONE
Internal Revenue Service
Revenue Agent

Amended Declaration of Nina Wu Stone
In Support of Amended Petition to Enforce
Internal Revenue Service Summonses           11